DECISION
These consolidated cases involve a family dispute over the appointment of a Guardian of the Person and of the Estate of Laurette Borduas Eifrig (Mrs. Eifrig), pursuant to chapter 15 of title 33 of the Rhode Island General Laws. Due to the complexity and sensitivity of the case, the Court will extensively review the facts.
 I Facts and Travel
Mrs. Eifrig is a ninety-year old woman with two daughters, Francine Ardito (Francine) and Suzette Eifrig Gephard (Suzette), and one granddaughter, Alicea Rose Ardito (Alicea).[1] Mrs. Eifrig also has one surviving sibling, her sister Hermine Eifrig (Hermine). Both Francine and her daughter Alicea live in Virginia. Suzette lives in Rhode Island. Hermine lives in Canada.
Mrs. Eifrig currently resides at Capitol Ridge, an assisted living community located on Smith Street in Providence, and she is Rhode Island registered voter. Previously, Mrs. Eifrig had lived near Francine in Virginia for approximately thirteen years. Mrs. Eifrig suffers from *Page 2 
macular degeneration and is legally blind. She also has experienced a recent decline in her physical and mental capacities including, but not limited to, short-term memory loss.
On May 26, 1995, Mrs. Eifrig executed a Trust in Virginia. The Trust named Mrs. Eifrig and Francine's then-husband Ralph Ardito, Jr. (Ralph), as co-trustees. Francine was named as an alternate co-trustee should Ralph either be unable or unwilling to serve. The Trust provided that upon Mrs. Eifrig's death, Francine would receive 50% of the proceeds outright. Suzette would receive the remaining 50% in the form of a twenty-five year annuity, with the remainder, if any, to Francine. On March 18, 1997, Mrs. Eifrig amended the Trust to provide for an outright payment of $10,000 to her sister Hermine. The remainder would be divided equally between Francine and Suzette.
On February 18, 2004, Mrs. Eifrig again amended the Trust. Ralph was removed as the co-trustee and was replaced by Francine. Suzette was named as the alternate co-trustee. Distribution of the Trust also was changed. The second amendment provided for an outright distribution of $10,000 to Hermine and $20,000 to Alicea. On the same day, Mrs. Eifrig executed a Durable General Power of Attorney, naming Francine as her attorney-in-fact, and an Advance Medical Directive naming Francine as her agent for health-care decisions.
Nine months later, on October 26, 2004, Mrs. Eifrig amended the Trust for a third time. Suzette was replaced by Alicea as the alternate co-trustee, and the distribution of the Trust once again was changed. Hermine's share remained unchanged; however, Ralph would also receive $10,000, and Francine would receive $200,000 before distribution of the remainder. With respect to the balance, it would be divided equally among Francine, Suzette, and Alicea. In addition to these changes, Mrs. Eifrig added an in terrorem clause that would revoke distribution to any beneficiary who challenged the validity of the Trust. When Francine later testified before *Page 3 
this Court, she stated that she had accompanied her mother when the Trust was established, and when each of the subsequent amendments was made.
On May 5, 2006, Suzette brought Mrs. Eifrig from Virginia to Rhode Island without Francine's knowledge. Apparently, Mrs. Eifrig was upset with Francine because she believed Francine wanted to place her in a nursing home. Francine filed a missing person's report with the Fairfax County Police Department on May 8, 2006, and on May 11, 2006, she filed a missing and endangered person's report.
On May 16, 2006, Suzette and Mrs. Eifrig consulted with Rhode Island Attorney Kenneth Dolbashian concerning the Trust. Attorney Dolbashian contacted Francine to verify her status as co-trustee, and it was then that Francine allegedly first learned that her mother was with Suzette. Francine attempted to contact her mother, but Suzette refused to allow any communication between Mrs. Eifrig and other family members.
On June 16, 2006, Suzette and Mrs. Eifrig went to Smith Barney to request a transfer of the Trust account to Rhode Island. In the alternative, they sought to withdraw $350,000 from the account. When Francine learned of this, she filed a Petition in the Barrington Probate Court on July 25, 2006, for a Five Day Waiver of Notice for Petition for Temporary Guardianship, as well as a Petition for Guardianship of Mrs. Eifrig. She simultaneously filed a Motion for a Temporary Ex-Parte Restraining Order (PC/06-3872) in the Rhode Island Superior Court pending the issuance of preliminary injunctive relief. Specifically, she sought
 "A. That Laurette Borduas Eifrig, and her personal representatives, successors, assigns, officers, agents, servants, employees and attorneys, be temporarily restrained and enjoined from alienating or encumbering or altering or amending or revoking any and all property, funds, estate planning documents, trust documents, bank and brokerage accounts and the like, until a hearing is had on Petitioner's application for a preliminary *Page 4 
injunction or decision of the above-stated Barrington Probate Court as to the appointment of Temporary and/or Permanent Guardian
 B. That Suzette Eifrig Gephard, and her personal representatives, successors, assigns, officers, agents, servants, employees and attorneys, be temporarily restrained and enjoined from using or causing to have used any and all credit cards in the name of Laurette Borduas Eifrig; be temporarily restrained and enjoined from alienating or encumbering or altering or amending or causing to have altered, amended or revoked, any and all property, funds, estate planning documents, trust documents, bank and brokerage accounts and the like, until a hearing is had on Petitioner's application for a preliminary injunction or decision of the above-stated Barrington Probate Court as to the appointment of Temporary and/or Permanent Guardian.
 C. A preliminary injunction be issued enjoining Laurette Borduas Eifrig and Suzette Eifrig Gephard, and their personal representatives, successors, assigns, officers, agents, servants, employees and attorneys, from alienating or encumbering or altering or amending or revoking any and all property, funds, estate planning documents, trust documents, bank and brokerage accounts and the like, during the pendency of this action." Complaint at 3.
On July 25, 2006, the Superior Court issued a Temporary Restraining Order "until a hearing is had on Petitioner's application for a preliminary injunction or decision of the . . . Barrington Probate Court as to the appointment of Temporary and/or Permanent Guardian."Ex-Parte Order dated July 25, 2006, at 1. On July 27, 2006, the Barrington Probate Court granted the petition for a waiver, and appointed Francine and Francine's counsel, Janet A. Mastronardi, as temporary Co-guardians pending a medical evaluation of Mrs. Eifrig and the completion of a Decision Making Assessment Tool (DMAT). Thereafter, Francine discovered that her mother was living in Warren, and that the Barrington Probate Court never had jurisdiction over the matter. Consequently, she re-filed the Petition for Guardianship in the Warren Probate Court.[2] *Page 5 
On August 8, 2006, this Court commenced a three-day hearing on the Petition for a Preliminary Injunction. At the hearing, Francine testified that her mother loved her independence, and that she previously had lived alone in a two-bedroom apartment approximately one mile from Francine's home in Virginia. Francine further testified that her mother had memorized the layout of her apartment and was able to use the two hot plates and microwave oven to prepare her own food. Francine said that she had taken care of her mother's needs such as errands, bills, and bookkeeping. She described herself as a "Girl Friday."
Francine then testified that her care-giving responsibilities increased as her mother's macular degeneration progressed. She said that her mother used to go to the local senior center where she would take part in activities such as bingo; however, as her mother's eyesight deteriorated, she began to have difficulty enjoying the daily activities provided by the senior center. Francine said that she suggested to her mother that she go to an adult day-care center where they could better take care of her needs. According to Francine, her mother became angry and refused to entertain the idea.
Francine also testified about her mother's finances. She said that her mother was a very private person who considered her finances to be her own business. Francine testified that, in accordance with her mother's instructions, whenever her mother received guests, she would remove all of her mother's financial documents from the apartment safe and temporarily store them at her own house. Francine stated that until December 2005, Suzette was unaware of the existence of the Trust, but that she found out about it when she arrived unexpectedly before Francine had a chance to remove her mother's financial documents from the apartment. Francine said that she just wanted the best for her mother and would like a third party to take care of her mother and to manage her funds. *Page 6 
On April 26, 2006, Suzette again arrived unexpectedly at her mother's apartment. It was around this time that Francine was attempting to send her mother to the adult day-care facility. In doing so, she had made an appointment for herself and her mother to tour the facility on May 4, 2006. Suzette insisted on accompanying them on the tour. Afterwards, they went to a restaurant. Mrs. Eifrig was angry and negative about going to the adult day-care center, and Suzette sided with her mother. Francine testified that she and Suzette began to argue, and that when Suzette told Francine that she (Francine) couldn't make people act against their will, Francine tossed a glass of water into Suzette's face and stormed out of the restaurant. On May 5, 2006, Mrs. Eifrig left Virginia with Suzette. Francine testified that she characterized her mother's departure as a "kidnapping."
Francine then testified that after Attorney Dolbashian contacted her, and she discovered her mother's location, she asked him to schedule a meeting in Rhode Island between herself, her mother, Suzette, and a representative from social services. A meeting was scheduled for May 24, 2006. The meeting later was cancelled because Suzette refused to attend. Francine said she and Hermine attempted to see her mother at Suzette's home, but no-one answered the door. She then said that they stood outside the house and yelled up at a lighted window for approximately twenty minutes before leaving.
Prior to the aforementioned scheduled meeting, Francine, in her capacity as co-trustee of the Trust, decided to freeze all of its assets so that Suzette would not have access to the funds. Later, Mrs. Eifrig requested Francine to give her all of her financial documents, but Francine refused. Francine testified that, as a registered nurse, she believed that her mother was suffering from dementia. She also believed that Suzette wanted to gain control of the Trust documents for her own benefit. *Page 7 
Hermine testified next. She said that she used to be close to Suzette, and that she frequently used to speak to her by telephone. Hermine said that she also was friendly with Francine. She testified that she visited with Mrs. Eifrig on April 13-19, 2006, and that she noticed that her sister's eyesight had deteriorated, and that she was more forgetful. Hermine further testified that Suzette constantly referred to the adult day-care center as a nursing home, and that Suzette told her that Francine was trying to "incarcerate" their mother. Hermine also testified that after Mrs. Eifrig went to Rhode Island, Suzette would not allow Hermine to speak with Mrs. Eifrig because, Suzette said, her mother was too angry to talk.
Mrs. Eifrig then took the stand. She testified that she has a Masters Degree in Education in Foreign Languages, was a registered nurse in Canada for twelve years, and taught French and Spanish at high school and college levels. She also testified that she saved and invested her money, and always managed her own investments.
Mrs. Eifrig stated that she had a good relationship with Francine, but that Francine did not approve of her spending money on travel. She said she had difficulties in Virginia and that she came to Rhode Island so that she could be independent, take care of herself, and be responsible for her own money. She vehemently stated that she did not want to be controlled, and said that the reason she left without telling Francine was that she wanted to avoid any difficulties.
Mrs. Eifrig then testified that she had been living in Warren for approximately seven to eight years. She said that she had no problem finding her way around her two-bedroom condominium. Mrs. Eifrig also stated that she goes for a walk every day, and that it takes her seven minutes to walk to the local Safeway store. None of these statements was accurate. *Page 8 
When asked on cross examination where she slept the previous night, Mrs. Eifrig said that she could not remember.
The last witness to testify was Pamela Roche (Ms. Roche), Operations Manager for Smith Barney in Providence. She testified that Mrs. Eifrig and Suzette presented themselves at her office to seek the transfer of money from Virginia to Rhode Island. When Ms. Roche told them that they could not make such a transfer, they then sought to withdraw $350,000. Ms. Roche testified that after she told them that the account had been frozen and would require the signatures of both trustees to unfreeze the account, Suzette became abusive and threatened a lawsuit under the Americans with Disabilities Act. Ms. Roche then testified that Suzette told her that she, Suzette, was the new co-trustee of the Trust; however, Suzette did not produce any documents to validate such a claim.
After the hearing concluded, the Court issued a bench decision in which it froze all of Mrs. Eifrig's assets, and prohibited access to those funds by either daughter or their counsel. The Court also appointed Paula Cuculo, Esquire (Ms. Cuculo), as Mrs. Eifrig's Guardian until the appropriate Probate Court resolved the issue of Guardianship. It should be noted that virtually from the outset, Mrs. Eifrig has been represented by Attorney Richard Boren, who has worked in concert with Ms. Cuculo to secure the safety and well-being of his client.[3]
On August 18, 2006, the Court entered an Order reflecting the bench decision. It found as a fact that "this is a sick, toxic situation," and that Mrs. Eifrig is "sharp, but vulnerable." See Order dated August 18, 2006, at 1. An Amended Order later was entered on September 27, 2006, to reflect that no findings of fact actually had been made; rather, the Court merely had made characterizations. Accordingly, the Court characterized the matter as a "sick, toxic *Page 9 
situation." The Court also opined that Mrs. Eifrig is a "sharp cookie," and observed that the Court is "mindful of her age . . . (and) her obvious vulnerabilities."
Both the August 18, 2006 Order and the September 27, 2006 Order directed that the Guardian shall: have unfettered access to Mrs. Eifrig; have access to all relevant Superior Court files; be provided with sufficient funds from the Trust for Mrs. Eifrig's support, needs and desires; have access to any and all information that the Guardian might need to competently fulfill the charge of the Court, including all medical and financial records; be entitled to notice of all Court proceedings; request, as needed, Court-ordered expert examinations of Mrs. Eifrig; determine the extent, if any, of visitation from family members; file pleadings, motions, petitions for relief and/or request for discovery necessary to protect Mrs. Eifrig's best interests. The Court also ordered counsel for the parties to provide all legal filings to Ms. Cuculo, and for each party and their counsel to fully cooperate with Ms. Cuculo in providing access to Mrs. Eifrig and to provide, within a reasonable time, any requested information.
Upon receipt of the signed Order, Ms. Cuculo immediately attempted to contact Mrs. Eifrig through Suzette; however, Suzette was unresponsive to Ms. Cuculo's numerous telephone calls. Ms. Cuculo then noticed that there were unusual charges reported on Mrs. Eifrig's credit card statement; consequently, she cancelled the account and put all the credit bureaus on notice that no further credit cards should be issued to Mrs. Eifrig. Ms. Cuculo also re-directed all of Mrs. Eifrig's mail to her own home.
Thereafter, Ms. Cuculo stopped receiving Mrs. Eifrig's mail. She learned from an inspector at the United States Postal Service (USPS) that Suzette had informed the USPS that she (Suzette) had been a victim of mail tampering, and she had convinced the USPS to reroute her mother's mail to her Barrington address. Ms. Cuculo asked the USPS to reroute Mrs. Eifrig's *Page 10 
mail back to her address. The USPS warned Suzette in writing that she could face criminal and civil penalties should she provide false information to the USPS again.
Meanwhile, Ms. Cuculo discovered that Mrs. Eifrig's monthly Social Security check had been diverted into a joint bank account opened by Suzette and Mrs. Eifrig. Ms. Cuculo instructed Social Security to re-direct the monthly checks back to her home, and she closed the joint bank account. Ms. Cuculo stated that she took all of these actions in an attempt to compel Mrs. Eifrig to reappear due to financial constraints.
Ms. Cuculo also discovered that when Mrs. Eifrig arrived in Rhode Island, she engaged the services of Rhode Island Attorney Tracey Napolitano to draft a new Trust Agreement, Will, Durable General Power of Attorney, and Durable Health Care Power of Attorney. Mrs. Eifrig then executed these documents. The new Trust was to distribute the bulk of its assets to Suzette. Upon learning of the existence of these new legal documents, Ms. Cuculo immediately revoked them.
In the meantime, Ms. Cuculo continued to try meeting with Mrs. Eifrig in order to assess her safety and wellbeing. When she learned that Mrs. Eifrig was living at Suzette's Warren residence, she went there on September 14, 2006, with Mrs. Eifrig's counsel, Attorney Boren, Officer Ken Medeiros of the Warren Police Department, and social case worker Carol Barker (Ms. Barker) from the Department of Elderly Affairs. Although they were convinced that Mrs. Eifrig and Suzette were present in the house when they arrived, no-one would answer the door. On September 15, 2006, Attorney Napolitano contacted Ms. Cuculo to advise her that Suzette was willing to host a meeting between her mother, herself, and Ms. Cuculo on September 19, 2006. Later, however, Mrs. Eifrig left messages on Ms. Cuculo's answering machine canceling *Page 11 
the meeting. Ms. Cuculo suspected that Suzette may have coached Mrs. Eifrig to leave the messages.
On September 25, 2006, Ms. Cuculo filed a Motion to Adjudge Suzette in Contempt of the Court's August 18, 2006 Order. Ms. Cuculo alleged that Suzette had refused to cooperate with the Order by denying Ms. Cuculo unfettered access to Mrs. Eifrig. On September 27, 2006, the Court ordered Suzette and Mrs. Eifrig to appear before the Court for a hearing on the contempt motion on October 3, 2006.
On October 3, 2006, Suzette's counsel, Denean M. Russo, submitted a written "Chronology of Communications with Suzette Eifrig Gebhard Evidencing Notice of Court Proceedings and Rulings" (Chronology) detailing all of the written communications between herself and Suzette since the August 10, 2006 hearing on the preliminary injunction. Chronology at 1. By letter dated August 16, 2006, Attorney Russo informed Suzette of the results of the preliminary injunction hearing. Id. On August 18, 2006, Attorney Russo forwarded to Suzette a letter from Laurette to Attorney Boren wherein she requested that the matter be removed to "Federal Court on an emergency basis."Id. at 1-2. Attorney Russo also forwarded a letter from Suzette to Ms. Cuculo acknowledging receipt of Attorney Russo's previous letter.Id. at 2. Several written communications between Suzette and Attorney Russo ensued. Id. Thereafter, on August 31, 2006, Attorney Russo sent to Suzette all recent correspondence and pleadings, as well as a copy of the August 18, 2006 Order.
On September 25, 2006, Attorney Russo sent more documents to Suzette, by overnight Federal Express, including Ms. Cuculo's Motion to Adjudge Suzette in Contempt and her own Motion to Withdraw as Counsel. Attorney Russo also notified Suzette that she (Suzette) had been ordered by the Court to bring Ms. Eifrig to Courtroom 10 on September 27, 2006. Two sets *Page 12 
of these documents were sent, one to Suzette's Warren address, the other to Suzette's Barrington address. Id. On September 28, 2006, Attorney Russo mailed a letter, again by overnight delivery to both of Suzette's addresses, informing her of the results of the September 27, 2006 hearing, and notifying her of the impending October, 3, 2006 contempt hearing and of the consequences for failing to appear, and notifying her of the Motion to Withdraw as Counsel.
Suzette and Mrs. Eifrig failed to appear at the October 3, 2006, scheduled hearing. At the hearing, Attorney Russo informed the Court of her efforts to contact Suzette. Attorney Boren and Ms. Cuculo also informed the Court of their attempts to communicate with Suzette in order to gain access to Mrs. Eifrig. Upon considering the representations of counsel, the Court issued body attachments for both Suzette and Mrs. Eifrig. The Court also granted Attorney Russo's Motion to Withdraw.
Thereafter, Ms. Cuculo located Mrs. Eifrig and Suzette at Suzette's Warren residence. Upon the advice of the Office of the Attorney General, Ms. Cuculo obtained an obstruction of justice warrant. On January 29, 2007, Ms. Cuculo went to the Warren residence accompanied by a member of the Warren police, Attorney Boren, and Attorney Mastronardi, and Ms. Barker.
When they arrived, they identified themselves to Suzette and explained to her why they were there. Suzette refused to open the door. Thereafter, members of the Warren Police and Fire Departments arrived in order to break down the door. Suzette was charged with obstruction of justice. She later was acquitted of the charge.
Ms. Cuculo testified that when she entered the house, she found Mrs. Eifrig to be a bit disheveled, suffering from poor hygiene, and rather hostile. Mrs. Eifrig refused medical care as she was convinced that there was a conspiracy against her. Ms. Cuculo said that because a medical evaluation was necessary before she could be placed in a residential setting, Mrs. Eifrig *Page 13 
was transported by ambulance to the geriatric psychiatric unit of Roger Williams Hospital for a pre-respite examination. Ms. Cuculo followed Mrs. Eifrig to Roger Williams Hospital and then met with her. She said that her introduction to Mrs. Eifrig was less than hospitable, but that she tried her best to communicate with her Ward.
Upon hearing Ms. Cuculo's testimony, the Court issued a Temporary Restraining Order against Suzette ordering that she have no contact with Mrs. Eifrig. The Court further ordered Ms. Cuculo and Attorney Boren to immediately go to Suzette's Warren residence, accompanied by members of the Warren Police Department, in order to remove personal items belonging to Mrs. Eifrig.
The next day, on January 30, 2007, Ms. Cuculo and Attorney Boren advised the Court that they had removed Mrs. Eifrig's personal belongings from Suzette's home, and that they then went to the hospital to meet with Mrs. Eifrig. Mrs. Eifrig told them that she understood everything that had happened, and that she was tired of moving around. She also indicated that she might be willing to enter into an assisted living facility, and she agreed to undergo psychiatric testing. Mrs. Eifrig also agreed to resume communications with Francine.
Five days after Mrs. Eifrig was admitted to Roger Williams Hospital, she was transported to Capitol Ridge, where she currently resides. Ms. Cuculo reported that, initially, she visited with Mrs. Eifrig frequently. She said that Mrs. Eifrig was protective of her privacy and said she was weary of unwanted intrusions. Once Ms. Cuculo was convinced that Mrs. Eifrig was comfortable and acclimated to her surroundings, she decreased her visits to once a week. Ms. Cuculo stated that Mrs. Eifrig seemed to enjoy the accommodations, entertainment, and routine activities at Capitol Ridge. *Page 14 
Early in February, 2007, Francine and Alicea came to Rhode Island to enjoy supervised visitation with Mrs. Eifrig. Ms. Cuculo stated that within a short period of time, Mrs. Eifrig was in high spirits and enjoyed their company. There was no mention of the ongoing legal situation, and by the end of the afternoon, Mrs. Eifrig suggested that she might like to move back to Virginia, where her family could visit her more often. It is a sentiment that she has expressed on occasion.
Meanwhile, on February 6, 2007, Dr. Andrew Rosenzweig met with Mrs. Eifrig to evaluate her, and to prepare a DMAT for use in the pending proceedings in the Warren Probate Court. Dr Rosenzweig diagnosed Mrs. Eifrig with moderate dementia due to Alzheimer's disease. SeeInitial Consultation, dated February 7, 2007, at 2. He noted that she suffers from significant deficits in memory, orientation, insight, and judgment. See id. He further stated that while it "is appropriate to have a court-appointed Guardian (in my opinion), she should still play an active role in the management of her finances." Id.
Doctor Rosenzweig conducted a Mini Mental Status Examination (MMSI) on Mrs. Eifrig to assist him in preparing the DMAT. In the DMAT, Dr. Rosenzweig concluded that Mrs. Eifrig's judgment was impaired and that her memory was moderately impaired. DMAT dated February 7, 2007, at 3. Dr. Rosenzweig further concluded that while Mrs. Eifrig is unable to make sound decisions concerning her finances, health care, and residential matters, she should be allowed to contribute to any such decisions. Id. at 5. He stated that Mrs. Eifrig is able to make limited decisions regarding her personal relationships as long as her "welfare/vulnerability" is protected. Id.
The Court ordered that Francine, Suzette, and Hermine each could separately visit Mrs. Eifrig in a supervised setting, but that they could not remove her from the facility. See Order *Page 15 
dated February 15, 2007, at 1-2. The Court also prohibited the three women from telephoning or writing to Mrs. Eifrig, and from discussing her finances, living arrangements or the subject of this litigation during their visits. Id.
On February 23, 2007, Dr. Rosenzweig met with Mrs. Eifrig for a follow-up evaluation. He found her to be "in a much improved psychological state." Follow-Up Mental Capacity Evaluation dated February 27, 2007, at 1. Mrs. Eifrig informed Dr. Rosenzweig that "`I like Rhode Island. I am well situated.' She stated that she `gets along with people. I do what I want to do'" Id. She told him that she was aware of the existence of her two daughters, and stated that she was "`content with my situation so long as I have my own bedroom and my independence." Id. at 2. Dr. Rosenzweig opined that Mrs. Eifrig's deficits were real but not changing, and that she was not suffering from delirium. Id. He then concluded his report by stating,
 "My opinion about [Mrs. Eifrig's] need for a Guardian has not changed. However, in view of the excellent adjustment to the Capitol Ridge Assisted Living Facility, where she has a good deal of independence, but enough supervision to provide for her needs and her safety, I feel that it is, in fact, preferable that she remain in the assisted living facility here with a Guardian that will involve her in decisions of importance and yet protect her from financial and other abuse and neglect. (Emphasis added.) Certainly, visits with her daughters should not be prevented. However, supervised visits seem to be an excellent idea to prevent undue influence that could adversely affect [her] psychological well-being." Id. (Emphasis added.)
On February 26, 2007, Attorney Mark A. Sjoberg, a Guardian adlitem who previously had been appointed by the Warren Probate Court, submitted a report to that court after visiting with Mrs. Eifrig.See Report of the Guardian ad litem. He found her to be pleasant, cooperative, and increasingly responsive as they discussed her current living arrangements. Id. at 2. Attorney Sjoberg reported that Mrs. Eifrig "acknowledged that she would likely require an assisted living *Page 16 
arrangement, stating that she could not live independently but would like to choose where that would be." Id. Mrs. Eifrig further "indicated that to the extent that she needed any assistance, it should be a complete stranger who is involved, indicating that she wants to `start anew.'" Id. She did not want either daughter to be involved with assisting her, because she did not want to be perceived as preferring one over the other. Id.
Attorney Sjoberg's report further stated that Mrs. Eifrig categorically rejected the idea of having Ms. Cuculo act as her Guardian because she had "declared me a ward" and had "created `all this trouble for me.'" Id. at 3. However, she also indicated that she previously had never met Ms. Cuculo. Id. Attorney Sjoberg concluded from these contradictory statements that Mrs. Eifrig's "objections were based on information that was provided to her from other sources, perhap[s] with their own agendas." Id. After some discussion, Mrs. Eifrig agreed to meet with Ms. Cuculo in the presence of Attorney Sjoberg. Id. According to Attorney Sjoberg, a "very good conversation" ensued, and that Mrs. Eifrig agreed with Attorney Sjoberg and Ms. Cuculo that it would be a good idea to join the Warren Probate Court matter with the Superior Court action. Id. They also agreed that that it would be logical for Ms. Cuculo to continue in her fiduciary role. Id.
Attorney Sjoberg found "that Mrs. Eifrig, when she is not confused by misinformation, can meaningfully participate in decisions that affect her, and under the public policy of the Guardianship statute, should be permitted to do so." Id. He further found that Mrs. Eifrig requires the assistance of a Limited Guardian of her Person and of her Estate with respect to major decisions that she is unable to make for herself.Id. at 3-4. Attorney Sjoberg recommended that Ms. Cuculo be appointed as Guardian because, he believed, "she now enjoys *Page 17 
the cooperation of Mrs. Eifrig which should grow to confidence as their relationship matures." Id. at 4.
On March 8, 2007, the Warren Probate Court convened a hearing on Francine's petition for Guardianship of the Person and of the Estate of Mrs. Eifrig. Without conducting an evidentiary hearing, and by agreement of the parties, the probate court entered a Consent Order for a stipulated appeal to this Court. Consent Order at 1-2. The probate court appointed Ms. Cuculo as the Temporary Limited Guardian and Permanent Limited Guardian of the Person and of the Estate of Mrs. Eifrig "without prejudice to and contemplating a stipulated appeal by any interested party for de novo consideration in the [S]uperior [C]ourt, consolidation with the pending equity action . . . and assignment for hearing and/or trial before Justice Gibney." Id. On March 22, 2007, an appeal was filed from the probate court.
On April 5, 2007, the Court amended the conditions of Francine's and Suzette's visitation with Mrs. Eifrig. Suzette was granted unsupervised visitation for "a maximum of two (2) times per week and for a maximum of one (1) hour at any given time." Order dated April 12, 2007, at 1. Before visiting, however, Suzette was required to give at least three hours notice to the staff at Capitol Ridge so that they "can have a heightened sense of alertness and notify [Ms. Cuculo] after any visit of any problems that may have occurred or agitation or concerns on the part of Laurette Borduas Eifrig." Id. Mindful that Francine resides in Virginia, the Court granted her unsupervised and unlimited visitation.Id. Hermine was given permission to telephone Mrs. Eifrig, provided that Mrs. Eifrig agreed to accept such calls. Id.
On April 6, 2007, the Court granted Ms. Cuculo's Emergency Motion to Discontinue [Suzette's] Visitation.[4] Suzette's visitation privileges were rescinded by the Court because, *Page 18 
earlier that day, she violated the terms and conditions of her visitation privileges when she caused Mrs. Eifrig to become visibly agitated and upset. See Order dated April 17, 2007. On May 5, 2007, the Petition for Guardianship and the injunctive relief actions were consolidated and set down for a hearing in the Superior Court on May 7 and 8, 2007.
On May 7, 2007, the Court commenced its hearing on the instant consolidated action. At the hearing, Francine testified that she only had seen her mother twice since the previous hearing in August, 2006: once in February, and once during the previous weekend. In her opinion, she thought that her mother's mental health had deteriorated; in particular, she thought that her mother's short-term memory had declined. She stated that she wanted to become her mother's Guardian and move her to another assisted-living facility in Virginia specializing in residents with low vision and Alzheimer's disease. She stated that she wanted to obtain Guardianship of the Person, but that she would be willing to forego Guardianship of the Estate. Francine said that she had not had much contact with Ms. Cuculo since her appointment as her mother's Guardian.
Ms. Cuculo was next to testify. She testified that Francine had been cooperative in providing her with documentation, and in helping with Mrs. Eifrig's tax returns. Ms. Cuculo further testified that she visits with Mrs. Eifrig every Friday, and that since January 29, 2007, she had seen her approximately twelve to fifteen times. Ms. Cuculo stated that Mrs. Eifrig positively responded when asked whether her living conditions are comfortable. She said that Mrs. Eifrig appeared to be content and has told her that she did not want to move to Virginia. However, she did say that Mrs. Eifrig also has suggested that she, Mrs. Eifrig, move to a facility that is located midway between her two daughters because she loves them both.
Hermine testified next. She stated that she had spoken to her sister approximately three times since being given the Court's permission: once at the August, 2006 hearing, a second time *Page 19 
in February of 2007, and the third time during the previous week. According to Hermine, Mrs. Eifrig said that she believed Capitol Ridge to be as good as any other like-facility, but that she was upset that her room did not have a telephone and that she received no visitors. Hermine said she would like the Court to appoint either Francine or Alicea as her sister's Guardian.
Twenty-seven-year-old Alicea then took the stand and testified that she is employed as a loan officer, and that she accompanied her mother on her mother's previous two visits with Mrs. Eifrig. She said that her grandmother was very happy to see them and that she had expressed a desire to see them more frequently. Alicea further stated that her grandmother appears to be happy, but that she is living "in the moment" with "no memories."
Alicea then expressed a willingness to serve as her grandmother's Guardian, and said that she felt very capable of keeping Mrs. Eifrig safe, comfortable and happy. She further stated that were she to be appointed as her grandmother's Guardian, she would ensure that only Mrs. Eifrig received any benefit from the Trust funds. Alicea admitted that although she was not familiar with Mrs. Eifrig's finances, she believed that she would be capable of managing them independent of her mother, provided that she received some guidance from a third party.
Alicea then stated that she is very close to both her mother and grandmother. She said that before the instant dispute, she used to speak with her grandmother approximately three times each week by telephone. She also said that the last time she spoke with her grandmother, Suzette monitored the telephone call and the conversation was "weird." Thereafter, the hearing was adjourned. It was reconvened in a dining/sitting room at the Capitol Ridge assisted living facility on May 8, 2007.
First to testify at Capitol Ridge was Dr. Rosenzweig. He testified that 95% of his practice involves geriatric psychiatry, and that he treats mental health issues such as dementia, *Page 20 
depression, and stress. He stated that on February 6, 2007, he met with Mrs. Eifrig for ninety minutes in order to perform a competency evaluation. According to Dr. Rosenzweig, the most important part of such an evaluation is face-to-face contact with the patient.
Doctor Rosenzweig testified that he performed two Mini-Mental Status Examinations (MMSE) on Mrs. Eifrig to evaluate her cognitive skills — the first on February 6, 2007, the second on February 23,, 2007. Mrs. Eifrig achieved a seventeen out of twenty-seven on the first MMSE, and an eighteen out of twenty-seven on the second one. Doctor Rosenzweig acknowledged that while competency evaluations are not an exact science, the accepted score for competency in the medical field is either a twenty-three or a twenty-four. Doctor Rosenzweig then diagnosed Mrs. Eifrig as suffering from dementia due to Alzheimer's disease, which he said is a progressive disease with continuous deterioration.
Doctor Rosenzweig then detailed his findings. He said that Mrs. Eifrig experiences moderate impairment of her memory, such that it only takes her two minutes to forget something. He then said that her judgment is impaired to the extent that she is unable to plan or make sound, executive decisions. He also stated that she has a poor ability to incorporate events into her decision-making process. Doctor Rosenzweig concluded that Mrs. Eifrig is an intelligent and wise woman who needs help in making decisions concerning her health care, finances, and residential matters. Doctor Rosenzweig testified that, although a Guardian should be appointed as a last resort, Mrs. Eifrig definitely needs someone to take care of her needs. He also concluded that she has the ability to contribute to important decisions, but that the Guardian should be responsible for making ultimate decisions after an appropriate consideration of Mrs. Eifrig's wishes. *Page 21 
With respect to her living conditions, Dr. Rosenzweig stated that it was clearly unsafe for Mrs. Eifrig to return to her home, and that she needs to stay in an assisted living facility where she can maintain a good quality of life. He said that she is incapable of determining where she should reside because she was unable to give a consistent answer when asked where she would like to live. Doctor Rosenzweig testified that he believed that staying at Capitol Ridge, with the assistance of a Guardian, would be in Mrs. Eifrig's best interests because she had made an excellent adjustment to the facility considering her unique psychological and social factors. Doctor Rosenzweig also stated that, clinically, it would not be a problem for Mrs. Eifrig to move to another facility, but that due to her vulnerability to a loss of routine, she may have adjustment problems. Doctor Rosenzweig said that Mrs. Eifrig should be permitted to partake in any decision about her living arrangements because being told where to live without her input would prove stressful.
Doctor Rosenzweig testified that Mrs. Eifrig talked very little about her two daughters. He said that she told him that she did not want to talk about the subject or to be perceived as taking sides. He opined that her desire to live midway between Rhode Island and Virginia was her manner of trying not to favor one daughter over the other, but he stressed that her dementia makes this an unsound decision. Doctor Rosenzweig stated that Mrs. Eifrig told him that she loves both of her daughters, and expressed a desire to see them more often. He then opined that their lack of visitation is not a significant stress factor for Mrs. Eifrig; however, the strained relationship between the two does cause her stress. Accordingly, Dr. Rosenzweig said that while Mrs. Eifrig is capable of deciding with whom to socialize, he opined that she may need supervised visitation from her daughters. *Page 22 
After Dr. Rosenzweig concluded his testimony, Mrs. Eifrig was escorted into the room to testify. According to Ms. Cuculo, Mrs. Eifrig was highly receptive to the idea of being interviewed in her own surroundings, and "expressed the desire that she would `like to speak with the Judge.'" Report of Court Appointed Guardian at 9.
Mrs. Eifrig discussed how her lack of vision affects her life.Transcript from the Testimony of Laurette Eifrig (Tr.) at 2-3. She said that she is unable to read and has difficulty writing. Id. at 3. She also stated that she attends musical concerts at Capitol Ridge, but that she requires assistance to get to the room where the concerts are held.Id. at 5. Mrs. Eifrig stated that she is afraid to go for walks on the grounds of the facility for fear that she would not remember her return path. Id. at 6. She acknowledged that she is a proud and independent person, and that she cares much about her appearance. Id. at 6-7
Mrs. Eifrig then spoke about her living arrangements. She said that she is knows that she lives in Rhode Island and that Francine lives in Virginia. Id. at 9. She also said that her independence is very important to her, and that the staff tries to help her. Id. at 7. One of the reasons she likes Capitol Ridge is the fact that she does not have to depend too much on others. Id. As far as the food, she finds it to be "all right[,]" but stressed that she is "not a food addict."Id. at 8. Mrs. Eifrig said she was fearful of being required to take a medical examination because "someone is going to find out I am not really capable of living on my own the way I am doing now, I must be under the direction of somebody else, and this is what frightens me the most. I — the little freedom that I have, I like to be able to exercise it as long as I live." Id. at 12. She said that she would not like being told where she could or could not go. Id. at 13.
Mrs. Eifrig first stated that she would like to move to Virginia to live near Francine and Alicea. Id. at 12. However, she later testified that "I would still prefer, if I had the choice and *Page 23 
could live with the freedom I just mentioned before, I prefer to live in Rhode Island." Id. at 14-15. The reason for this preference is that "[i]t seems that whatever I want to do in Rhode Island is easier for me to do. There's always someone, something — or something to help me do what I want to do." Id. at 19.
Mrs. Eifrig was asked about the obvious discrepancy between her two answers concerning where she would like to live. Id. at 18-19. She responded by saying
 "most of all I think I like to live in Rhode Island, that's my favorite place of living, but I realize that it would make it difficult for other people to do the same. But, of course, you can't see your family or your friends every day or every week, or there should be a time when we could get together and we would get together and it should be sufficient. We can write. We can call, telephone. I don't have a telephone now, but I could if I have to get in touch with them." Id. at 19.
Mrs. Eifrig then said that she did not see any necessity in having a telephone in her room. Id. at 20. While admitting that a telephone in her room would make it easier to make and receive telephone calls, she stated that "we don't need to get in touch that often, really. See, the telephone is with you every day. You wouldn't want anybody to call you every day, at least I wouldn't want that. . . ." Id. at 20.
Mrs. Eifrig was asked whether she had any dislikes concerning her living arrangements at Capitol Ridge. She responded:
 "Well, I just — I guess it would be the same thing as what I wouldn't like if I were to live somewhere else. I can't do everything on my own. I have to do something with the help of somebody else, and I like to be independent. I don't like to be dependent to others to do — to live normally, I would say." Id. at 8.
Mrs. Eifrig later testified that she would like to see her family members more often, and that "my family was always precious to me."Id. at 10. She also said that Suzette and Francine have two very different personalities, and that *Page 24 
 "Francine is more — she usually controls things. She likes to do things her own way, and that's where we have a difference of opinion at times. She likes to do some things some ways, and I don't like it, and, well, sometimes I feel I have to do what her — her presentation of the doing is because this is how I'm going to be helped by someone." Id. at 10-11.
She stressed, however, that she gets along with both of her daughtersId. at 11. She later stated that she would be willing to offer financial assistance to both Francine and Alicea so that they could visit with her Rhode Island more frequently. Id. at 15-16
On the issue of her finances, Mrs. Eifrig stated that she was "not very amenable" to having another person "decide what I should buy and not buy or let go, that's my own to decide." Id. at 13. She further testified that "I would trust anyone in paying my bills, but I wouldn't trust anyone in making medical decisions for me." Id. at 14. She did say, however, that she would be agreeable to listen to input from others before making any such medical decisions. Id.
After Mrs. Eifrig concluded testifying, Dr. Rosenzweig, who had remained in the room to hear her testimony, again took the stand. He stated that he was impressed by her courage, and he observed that she was not agitated and had adjusted well. He then observed that Mrs. Eifrig's testimony was inconsistent and confused, and he remained convinced that she is not capable of making key decisions. However, he still believed that her opinions should be considered before any such key decisions are made. Closing arguments on the issue of the Guardianship of the Person and of the Estate of Mrs. Eifrig were made by respective counsel.
Three days later, on May 11, 2007, Francine, in her capacity as co-trustee of the Trust, attempted to remove all of the Trust funds held in the Smith Barney account. Likewise, on May 18, 2007, she put Resource Bank "on notice that no funds are to dispersed for any reason without my prior written approval." Letter from Francine to Resource Bank dated May 18, 2007. She *Page 25 
further instructed Resource Bank to close the account "in order to open a CD at a higher interest rate." Neither bank honored Francine's request.
On May 24, 2007, Francine's Virginia counsel informed Resource Bank that Francine intended to take legal action against the bank if it continued to refuse to release the Trust funds. On May 29, 2007, Resource Bank informed Ms. Cuculo that it intended to file an interpleader action in a Virginia Court to determine entitlement to the funds. Thereafter, Attorney Boren filed with this Court a motion to hold Francine in contempt of the Court's August 18, 2006 Order which had frozen all of Mrs. Eifrig's assets. He sought the Court to enjoin and restrain Francine from taking any action to alienate, distribute, or in any fashion unfreeze the Trust funds. He further sought the Court to enjoin and restrain Francine from filing any lawsuit in Virginia pertaining to the alienation, distribution, and/or transfer of any of the Trust funds.
In response, Francine contended that by its own terms, the August 18, 2006 Order only was in effect "until such time as the issue of Guardianship has been resolved in the appropriate Probate Court." She then asserted that when the Warren Probate Court entered the Consent Order appointing Ms. Cuculo as Guardian, the Consent Order resolved the Guardianship issue and superseded the August 18, 2006 Order that had frozen the Trust funds.
On June 3, 2007, the Court ordered the funds to remain frozen, and authorized Ms. Cuculo and Attorney Boren to retain counsel in Virginia, if needed, to defend any interpleader actions. The Court further ordered that it would entertain a motion to unfreeze sufficient Trust funds to retain Virginia counsel on Mrs. Eifrig's behalf. The Court also revoked Francine's visitation privileges. A hearing on the contempt motion was scheduled for June 18, 2007.
Meanwhile, on June 1, 2007, Resource Bank had filed an interpleader action in Virginia against the Trust, Francine, Ms. Cuculo, and Mrs. Eifrig. Smith Barney filed a similar suit on *Page 26 
June 12, 2007. Also on June 12, 2007, Attorney Boren filed a Motion to Remove Francine Eifrig Ardito as Trustee and Appoint a Substitute Suitable Person as Trustee. On June 13, 2007, Attorney Boren filed a Motion to Unfreeze Sufficient Trust Funds to Retain Counsel to Defend the Interpleader Actions Brought in Virginia. Both the Motion to Remove and the Motion to Unfreeze were scheduled for hearing on June 18, 2007. Francine objected, asserting that she did not receive the requisite ten-day notice for the hearing, as mandated by Super. R. Civ. P. 6(c).
On June 18, 2007, Attorney Mastronardi informed the Court that Francine had discharged her from the case on the afternoon of June 15, 2007, via faxed letter. She stated that Francine intended to represent herself, pro se, in the matter.
Attorney Boren objected to any release of Attorney Mastronardi from the case until such time as Francine actually enters her appearance. Suzette's counsel, James McCormick, also objected, suggesting that Francine was engaging in delay tactics. The Court ruled that Attorney Mastronardi would not be excused from representation of Francine until Francine entered her appearance, and that to rule otherwise, would leave control of Mrs. Eifrig's funds "in limbo." The Motion to Remove Francine Eifrig Ardito as Trustee and Appoint a Substitute Suitable Person as Trustee was scheduled for hearing on June 26, 2007.
The Court entered an Interim Order restraining Francine, in any capacity, from seeking release of any Trust funds, wherever located. Any violation of such Order would be subject to a contempt finding.Interim Order dated June 18, 2007, at 2. The Court further ordered that only Ms. Cuculo has any right to access the Trust funds, and it ordered her to take possession of said funds to use for Mrs. Eifrig's needs and to retain Virginia counsel. Id.[5] Finally, the Court *Page 27 
reinstated Suzette's conditional privilege of supervised visitation; provided, however, that she coordinate her visits with Ms. Cuculo before she makes such visits. The Court also ordered that any visitation from Ralph Ardito (Francine's ex-husband) also shall be coordinated with Ms. Cuculo and, likewise, supervised.
At the conclusion of the hearing, counsel stipulated that no party intended to submit any additional evidence on the Guardianship issue. Consequently, the Court will now address only the issue of the Guardianship of the Person and of the Estate of Mrs. Eifrig. All other pending matters will be addressed at a later date.
 II Standard of Review
Section 33-23-1(a) of the Rhode Island General Laws provides that "Any person aggrieved by an order or decree of a probate court . . . may, unless provisions be made to the contrary, appeal to the superior court for the county in which the probate court is established. . . ." This Court reviews such appeals on a de novo basis. See In re: Taylor'sEstate, 114 R.I. 562, 337 A.2d 236 (R.I. 1975) (criticizing the Superior Court for not conducting a de novo review of an appeal from a probate court).
Chapter 15 of title 33 of the Rhode Island General Laws provides for the appointment of a limited Guardian or Guardian for adults. The purpose of the Act is
 "to promote the public welfare by establishing a system that permits incapacitated persons to participate as fully as possible in all decisions affecting them; that assists such persons in meeting the essential requirements for their physical health and safety, in protecting their rights, in managing their financial resources, and developing or regaining their abilities to the maximum extent possible; and that accomplishes these objectives through providing, in each case, the form of assistance that least interferes with the legal capacity of a person to act in his or her own behalf." G.L. 1956 33-15-1. *Page 28 
The Legislature also recognizes "that it is desirable to make available, the least restrictive form of Guardianship to assist persons who are only partially incapable of caring for their needs." Id. In order to accomplish these goals, the Legislature mandates that "[t]his chapter shall be liberally construed. . . ."
Section 33-15-2 provides in pertinent part: "[a]ny person may file with the probate court clerk, in the city or town where the proposed ward resides or where an out of state proposed ward has property, a verified petition for the appointment of a Guardian." In appointing a Limited Guardian,
 "the court shall limit the scope of the powers and duties of a Guardian to the terms best suited to allow the individual found partially incapacitated to participate as fully as possible in decisions affecting him or her . . . The court shall not appoint a Guardian or limited Guardian if the court finds that the needs of the proposed ward are being met or can be met by a less restrictive alternative or alternatives. The court shall authorize the Guardian to make decisions for the individual in only those areas where the court finds, based on one or more decision making assessment tools, that the individual lacks the capacity to make decisions. The court must strike a delicate balance between providing the protection and support necessary to assist the individual and preserving, to the largest degree possible, the liberty, property and privacy interests of the individual." § 33-15-4(a)(1).
Having set out the statutory groundwork, the Court now will address the issues raised in this appeal.
 III Analysis
In the instant matter, Francine timely appealed from a Consent Order entered in the Warren Probate Court, appointing Ms. Cuculo as a Temporary Limited Guardian and Permanent Limited Guardian of the person and of the estate of Mrs. Eifrig. She contends that a less *Page 29 
restrictive alternative to Guardianship of the Person would be Mrs. Eifrig's Advance Medical Directive, authorizing Francine to make medical decisions on Mrs. Eifrig's behalf. Similarly, she maintains that Mrs. Eifrig's Durable Power of Attorney, giving Francine authority to act on her mother's behalf regarding the assets and property not in Trust, constitutes a less restrictive alternative to Guardianship of the Estate.
This Court has carefully and exhaustively reviewed all of the evidence before it. The Court finds Dr. Rosenzweig's thoughtful and exhaustive testimony and his evaluative reports credible and compelling. He diagnosed Mrs. Eifrig as suffering from dementia due to Alzeimer's disease, and said that this condition is a progressive disease which only will worsen. His testimony, the DMAT, and the MMSEs demonstrate that Mrs. Eifrig's judgment and memory are impaired. These impairments, coupled with the fact that she is legally blind, result in her inability to fully care for herself or make important decisions on her own.
Consequently, although the Court finds Mrs. Eifrig to be a very intelligent, sharp, and well-spoken woman, it is clear, based upon the clear and convincing evidence, that her physical and mental condition, as exhaustively detailed by Dr. Rosenzweig, warrants the appointment of a Guardian of the Person and of the Estate of Mrs. Eifrig. Such Guardian will assist Mrs. Eifrig in meeting the essential requirements for her physical health and safety, protecting her rights, in managing her financial resources, and developing or regaining her abilities to the maximum extent possible. The Guardian also must allow Mrs. Eifrig to participate as fully as possible in all decisions that affect her.
The Court recognizes Mrs. Eifrig's fierce determination to maintain as much independence as possible, though she admits that she needs assistance in order to maintain the level of independence that she currently enjoys at Capitol Ridge. The Court finds telling the fact *Page 30 
that Mrs. Eifrig does not wish to have a telephone installed in her room, and believes that this is indicative of how protective she is of her privacy, independence, and her well-being. It is clear through Mrs. Eifrig's testimony, Ms. Cuculo's testimony, and, particularly, Dr. Rosenzweig's testimony, that she prefers to distance herself from her daughters' mutual acrimony. Doctor Rosenzweig and Ms. Cuculo both testified that Mrs. Eifrig has adjusted very well to her current living situation and that she appears to be content with this arrangement. Mrs. Eifrig appeared happy and relaxed when she testified at Capitol Ridge. As Dr. Rosenzweig observed, she is a strong woman who has managed to overcome her unique psychological and social factors.
Although Mrs. Eifrig loves both of her daughters equally, the Court does not believe that either of them would be a suitable or appropriate Guardian of the Person and/or of the Estate of Mrs. Eifrig, nor would her granddaughter or former son-in-law. As Dr. Rosenzweig observed, the animosity between the two sisters causes Mrs. Eifrig stress and discomfort. And it is Mrs. Eifrig's safety, comfort, and well-being that are the paramount concerns of the Court
Dr. Rosenzweig's suggestion that Francine and Suzette should be allowed only supervised visitation with their mother further bolsters this Court's conclusion that they are unsuitable to care for Mrs. Eifrig's support, needs and desires or make decisions on her behalf. Indeed, given the animosity that exists between and among the various members of this family, the Court concludes that not one family member would be an appropriate Guardian of the Person and/or of the Estate of Mrs. Eifrig. This is particularly true with respect to Alicea, who shares her mother's opinions as to the circumstances of this dispute, and whose negative regard for Suzette was palpable. In an ideal world, Francine's contention that Mrs. Eifrig's Advance Medical Directive and Durable Power of Attorney would be less restrictive alternatives to Guardianship of the Person and of the Estate of Mrs. Eifrig might have merit; however, given the *Page 31 
facts and circumstances of this particular case, such an argument not only is unpersuasive, but its application would be inappropriate, contra-indicated and, potentially, harmful to Mrs. Eifrig.
The Court finds Mrs. Eifrig to be a resilient, but vulnerable, woman who needs someone to provide support and care for her wellbeing, and to look out for her best interests. Her family members are unsuitable for that task. Recognizing the commendable and yeoman's work that Ms. Cuculo has performed during the course of this litigation, coupled with an obvious bond that the Court observed at Capitol Ridge between Mrs. Eifrig and Ms. Cuculo, the Court appoints Ms. Cuculo as Guardian of the person and of the estate of Mrs. Eifrig. As Attorney Sjoberg observed when he recommended Ms. Cuculo to be Mrs. Eifrig's Guardian, their relationship "should grow to confidence" as it matures. It appears that it has. The Court notes that it observed the interaction between Ms. Cuculo and Mrs. Eifrig at Capitol Ridge. Their exchanges were heartfelt, humorous and affectionate, and Mrs. Eifrig was clearly comfortable conversing with Ms. Cuculo, and not shy about expressing her opinions. Their relationship seemed mutually respectful. The Court further notes the time and attention Attorney Boren has devoted to his client. The Court has observed the interaction between Attorney Boren and Mrs. Eifrig, who clearly enjoys, and is comforted by, his presence. Attorney Boren and Ms. Cuculo have served the interests of Mrs. Eifrig well.
Ms. Cuculo shall have sole access to the Trust income, and access to the principal if she successfully petitions and revokes the Trust for good cause. See VA. CODE ANN. § 37.2-1024(D).[6] Meanwhile, the Trust and any other assets shall remain frozen at all locations, as to all persons but Ms. Cuculo, in accordance with the Court's August 18, 2007 Order. *Page 32 
Mindful that the Court should impose "the least restrictive form of Guardianship to assist persons who are only partially incapable of caring for their needs" (§ 33-15-1), and acknowledging that, although Mrs. Eifrig is unable to make sound decisions concerning her finances, health care, and residential matters, she is capable of contributing to any such discussions and decisions, the Court orders the Guardian to consider Mrs. Eifrig's wishes, as suggested by Dr. Rosenzweig, when such decisions are made. Ultimately, however, Ms. Cuculo will be responsible for making all final decisions.
In view of Mrs. Eifrig's willingness to provide financial support to Francine and Alicea to facilitate their visitation with her, the Court permits Ms. Cuculo to provide reasonable financial assistance from the Trust to pay for one visit per month for either Francine or Alicea provided, however, that there are no Court ordered restraints on their visitation, and Ms. Cuculo determines that there are sufficient funds available in the Trust for such additional expenses. Trust funds should not be used to pay for any other visits that either Francine or Alicea may wish to make. The Court further finds that Capitol Ridge provides a safe, comfortable, and nurturing environment. There is ample evidence to indicate that Mrs. Eifrig has happily adjusted to living there, that she is, indeed, thriving there, and that she is content with the level of independence that it provides her. The Court will not disrupt the now comfortable rhythm of her life. Consequently, Mrs. Eifrig shall remain a resident of Capitol Ridge, until further Order of the Court.
Suzette's supervised visitation privileges and telephone privileges are reinstated, provided, however, that such visits and telephone calls are coordinated with Ms. Cuculo, who will give notice to Capitol Ridge personnel so that they "can have a heightened sense of alertness *Page 33 
and notify [Ms. Cuculo] after any visit of any problems that may have occurred or agitation or concerns on the part of Laurette Borduas Eifrig." Order dated April 12, 2007, at 1. Said privileges will be suspended if they result in Mrs. Eifrig becoming agitated and/or disturbed. Suzette is prohibited from raising any subject that might cause agitation, including, but not limited to, any mention of this litigation, the Trust and/or finances, the ill will between her and Francine, and any potential inheritance matters. The same conditions apply to any visits or telephone calls from Francine, if and when her privileges are reinstated, and also to Alicea, Ralph, and Hermine.
 IV Conclusion
For the foregoing reasons, this Court appoints Ms. Cuculo as Guardian of the person and of the estate of Mrs. Eifrig. Ms. Cuculo shall consider input from Mrs. Eifrig on key issues before making any decisions that affect Mrs. Eifrig. The ultimate decisions are Ms. Cuculo's alone. Ms. Cuculo shall have sole access to the Trust income, and the Trust shall remain frozen as to everyone else. Furthermore, Ms. Cuculo is authorized, as she sees fit, and if there are sufficient resources available, to pay the reasonable expenses of a monthly visit to Mrs. Eifrig by either Francine or Alicea. The Court retains jurisdiction over all other pending matters, including the Motion to Remove Francine as Co-Trustee, and the Motion to Adjudge Francine in Contempt.
Counsel shall submit an appropriate Order for entry.
[1] Mrs. Eifrig was eighty-nine when this action commenced. She turned ninety last October.
[2] Suzette owns two Rhode Island homes, one in Barrington and the other in Warren.
[3] For a period of time, when Mrs. Eifrig's whereabouts were unknown, Attorney Boren made every effort to locate his client?singularly, and together with Ms. Cuculo.
[4] The April 6, 2007 emergency motion was heard, ex parte, via telephone. An Order later was entered on April 17, 2007.
[5] The Court notes that during the June 18, 2007 hearing, Ms. Cuculo informed the Court that Mrs. Eifrig told Ms. Cuculo that she had intended for the remainder of the Trust proceeds to be distributed equally to Francine, Suzette and Alicea, and was unaware that she had amended the Trust to distribute $200,000 to Francine before distribution of the remainder.
[6] Section 37.2-1024(D) of the Virginia Code provides that a conservator or Guardian:
 "may exercise the incapacitated person's power to revoke or amend a trust or to withdraw or to demand distribution of trust assets only with the approval of the court for good cause shown, unless the trust instrument expressly provides otherwise." VA. CODE ANN. § 37.2-1024(D) (emphasis added). *Page 1